**Sara Jane JONES–McNAMARA,**
**Plaintiff–Appellant,**

v.

**HOLZER HEALTH SYSTEMS,**
**Defendant–Appellee.**

No. 15–3070.

United States Court of Appeals,
Sixth Circuit.

Nov. 2, 2015.

Before: SUHRHEINRICH and MOORE, Circuit Judges; VAN TATENHOVE, District Judge.*

SUHRHEINRICH, Circuit Judge.

Plaintiff–Appellant Sara Jane Jones–McNamara ("McNamara") appeals the district court's order granting summary judgment to Defendant–Appellee Holzer Health Systems, Inc. ("Holzer") in her ac-

---

* The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

tion alleging that Holzer terminated her in violation of the False Claims Act ("FCA")'s anti-retaliation provision, 31 U.S.C. § 3730(h). We affirm, but for reasons different than those articulated by the district court.

## I. BACKGROUND

### A. Facts

Holzer is a health care delivery system comprised of several hospitals and care facilities in southeastern Ohio. ID # 3329–3331. McNamara began work for Holzer as Vice President for Corporate Compliance on March 1, 2010. ID # 79. Shortly after starting work, McNamara began investigating allegations that Holzer's dealings with a patient transport company called Life Ambulance ("Life") violated the Anti–Kickback Statute ("AKS"), 42 U.S.C. § 1320a–7b. Holzer and Life had a preferred supplier agreement under which Life promised to make its best efforts to be available upon Holzer's request. ID # 859. This agreement, however, is not what sparked McNamara's concerns about potential AKS violations; in fact, McNamara assumed the contract was legal. ID # 861–62. McNamara's concerns arose when she received a phone call on May 8 and an e-mail on May 11 from Tina Baker, a Holzer Emergency Room nurse, alleging that "certain hospital ER doctors" received embroidered jackets from Life. ID # 875–77, 4894, 5084. McNamara ultimately confirmed the receipt of only one such jacket, which she later valued at $23.50. ID # 879–80, 2358. Baker also claimed that Holzer employees consistently called Life over its competitor MedFlight for ambulance services despite the fact that Life was "more than double the distance and time" from Holzer compared to MedFlight. ID # 875–76, 4894. On May 10, after speaking to Baker on the phone but before receiving her e-mail, McNamara e-mailed

James Phillippe, the President of one of Holzer's hospitals, to inform him of an "[a]llegation of [a] potential kickback issue in [the] ER." ID # 4899.

On May 13, McNamara learned from Holzer's Director of Community and Wellness, Bonnie MacFarlane, that Life had provided free hotdogs and hamburgers at Holzer's employee health and wellness fairs in 2008 and 2009, ID # 888, 4888, 4890, 4903 (under seal), 5085. McNamara further discovered on May 18 that Life similarly would supply free hotdogs at Holzer's upcoming health and wellness fair the following day. ID # 865, 4889, 4903 (under seal), 5086. Despite McNamara's objection that this event violated the AKS, she allowed the event to proceed. ID # 865.

Based on this collection of facts—Baker's unverified allegation that Life was receiving preferential referrals, one doctor's receipt of a $23.50 jacket, and Life's provision of hotdogs at past wellness fairs and the upcoming wellness fair—McNamara sent the following May 18 e-mail to CEO Brent Saunders and Vice President of Human Resources Lisa Halley: "We definitely do have an anti-kickback issue with Life and after Wed [the 2010 health and wellness fair] I will not ever ok their donating. [sic], sponsoring or equipping, etc. anything at Holzer again." ID # 4904. McNamara explained in the e-mail that she would allow the upcoming wellness fair to proceed because "I decided I should have a solid case before I start banning things." *Id.* After sending this e-mail, McNamara met in person with Saunders, who instructed McNamara not to reduce her conclusions to writing before completing her investigation. ID # 892, 2617–18, 4934.

The following day, McNamara verbally reiterated to Saunders her concern that Holzer had violated the AKS and needed

to pay back the federal government. ID # 900. Following the meeting with Saunders, McNamara sent an e-mail to Saunders, Phillippe, and Halley providing an update on her investigation and proclaiming "[a]nti-kickback violations (we have one of them) are illegal." *Id.* Saunders repeated his verbal directive to McNamara not to put conclusions of illegal activity in writing before completing her investigation.[1] ID # 906–07, 4934.

McNamara never clarified for what items or services she believed Holzer needed to reimburse the government. At one point, McNamara testified she told Saunders that Holzer needed to pay back the government "for all these hot dogs, hamburgers, coats, jackets, and stuff." ID # 1219 (sealed).[2] But McNamara also testified that during her investigation she thought Holzer might have billed Medicare for Life's ambulance services, in which case Holzer would need to return the government's payment for any services tainted by kickbacks. ID # 90–102. McNamara later contradicted her own testimony, however, when she stated that Life, not Holzer, billed for ambulance services. ID # 1219 (sealed).

Sometime thereafter, McNamara determined based on records of patient transports that out of the 102 patient transports Holzer referred to an ambulance company between January and April 2010, Holzer referred 93 to Life. Appellant Br. 10; ID # 4892, 4893. McNamara testified that she completed her investigation into the anti-kickback violations upon reporting these statistics to Saunders. ID # 864, 1005.

On June 30, 2010, Saunders and Halley terminated McNamara's employment. ID # 3204.

## B. Procedural History

McNamara's amended complaint alleges she was terminated in retaliation for her investigation of Holzer's FCA violations as prohibited by 31 U.S.C. § 3730(h) and raises five additional state law claims related to her termination. ID # 68–72. The district court granted Holzer's motion for summary judgment on McNamara's FCA retaliation claim and declined to exercise supplemental jurisdiction over McNamara's remaining state law claims. ID # 5488–89.

The district court's opinion rests on two primary grounds: lack of direct evidence of retaliation, and McNamara's inability to prove that Holzer's stated reasons for her termination are pretext. In its ruling, the district court assumed McNamara could establish the first two elements of her retaliatory discharge claim: 1) protected activity, and 2) Holzer's knowledge that McNamara engaged in protected activity. ID # 5477. The district court instead focused on the third element of McNamara's claim, causation, i.e. that Holzer terminated her because of her protected activity. *Id.* The district court rejected McNamara's "direct" evidence because it demanded inferences to find that Holzer acted out of impermissible retaliation. ID # 5478–82. The district court then considered whether, viewing McNamara's evidence as circumstantial, it satisfied the burden-shifting framework of *McDonnell*

---

1. Saunders testifies he gave his second instruction not to reduce conclusions to writing after McNamara sent her May 19 e-mail. ID # 2618, 4934. McNamara agrees Saunders gave her this instruction on May 19, but she does not say whether he gave it before or after she sent the May 19 e-mail. ID # 900, 906–07.

2. This testimony is nonsensical since Holzer would not bill (and thus would not need to reimburse) Medicare for hotdogs or other goods received from Life.

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For this purpose, the district court assumed that McNamara established all three elements of her prima facie case and allowed the burden of production to shift to Holzer to present a legitimate, non-retaliatory reason for McNamara's discharge. ID # 5482. The district court found that Holzer adequately identified lack of professionalism and interpersonal skills as a non-retaliatory reason for terminating McNamara, emphasizing McNamara's insubordination in disobeying Saunders' instruction not to send e-mails indicating a kickback violation had occurred without completing her investigation. ID # 5483–84. The district court then analyzed whether McNamara met her burden of showing Holzer's offered reasons were pretexts and ultimately concluded she could not prove Holzer's reasons were insufficient to motivate her termination. ID # 5485.

McNamara filed a timely notice of appeal of the district court's grant of summary judgment. ID # 5493–94. On appeal, McNamara challenges the district court's rulings on the direct evidence and pretext issues. Appellant Br. 2. This panel has jurisdiction over McNamara's appeal under 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir.2014). Summary judgment is proper where the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a). The court must view all evidence in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a defendant demonstrates the absence of a genuine dispute of material fact on at least one element of the plaintiff's claim, the plaintiff must present sufficient evidence from which a jury could reasonably find in her favor. *Emswiler v. CSX Transp.*, 691 F.3d 782, 788 (6th Cir. 2012). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 526–27 (6th Cir.2012) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505).

## III. ANALYSIS

### A. Retaliatory Discharge Under the FCA

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To protect employees who expose fraud against the federal government, the FCA's anti-retaliation provision forbids discharging an employee "because of lawful acts done ... in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).[3]

Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retalia-

---

**3.** A slightly different version of § 3730(h) was in effect at the time of McNamara's termination that protected employees from retaliation for "lawful acts done ... in furtherance of other efforts to stop 1 or more violations of

this subchapter." 31 U.S.C. § 3730(h) (effective Mar. 23, 2010 to July 21, 2010). Congress amended the language to its present version in July 2010.

tion claims. *Scott v. Metro. Health Corp.*, 234 Fed.Appx. 341, 346 (6th Cir.2007). The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive. *See Spengler v. Worthington*, 615 F.3d 481, 491 (6th Cir.2010); *Anthony v. BTR Automotive Sealing Sys., Inc.*, 339 F.3d 506, 514 (6th Cir.2003).

Direct evidence is "evidence, which if believed, does not require an inference that unlawful retaliation motivated an employer's action." *Spengler*, 615 F.3d at 491. Where a plaintiff produces direct evidence of retaliation, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000).

Where a plaintiff proceeds with circumstantial evidence of retaliation, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies. Under the *McDonnell–Douglas* test, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir.2013). To establish a prima facie case, the plaintiff must show the following elements: (1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. *Fuhr*, 710 F.3d at 674. At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination. *Id.*

## B. Protected Activity

McNamara contends that she engaged in protected activity by investigating Holzer's ongoing violations of the AKS and the FCA and reporting those violations to Saunders, Phillippe, and Halley. Appellant Br. 19. As noted, the district court assumed McNamara had made out a prima facie case and held that McNamara failed to rebut Holzer's non-discriminatory reasons for her discharge with evidence of pretext. ID # 5482, 5485. We conclude that McNamara did not establish a prima facie case because she has not created a genuine issue of material fact as to whether she engaged in protected activity. Specifically, McNamara failed to produce sufficient evidence that her investigation and reports of Life's provision of a jacket and hotdogs to Holzer employees rested on a reasonable belief in AKS or FCA violations.

### 1. Standard for Protected Activity

The Sixth Circuit held in *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir.2000), that internal reports "may constitute protected activity," provided such internal reports "allege fraud on the government." *McKenzie* interpreted an earlier version of 31 U.S.C. § 3730(h) that protected "lawful acts ... in furtherance of an action under this section including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h) (effective to Mar. 23, 2010). The *McKenzie* court found that internal reports of fraud fell within this language since the expressly listed actions were not exclusive. *McKenzie*, 219 F.3d at 515. Congress later amended the lan-

guage interpreted in *McKenzie* to protect "lawful acts ... in furtherance of other efforts to stop 1 or more violations of this subchapter," 31 U.S.C. § 3730(h) (effective Mar. 23, 2010, to July 21, 2010), rather than those "in furtherance of an action under this section." 31 U.S.C. § 3730(h) (effective to Mar. 23, 2010). This amended language was in effect at the time of McNamara's termination. *McKenzie*'s recognition of protection for internal reports of fraud still applies under the amended version of § 3730(h). Statutory protection for all "efforts to stop" a FCA violation simply affirms *McKenzie*'s understanding that the activities listed in the previous version of § 3730(h) were not exhaustive and included internal reports of fraud. *See Mikhaeil v. Walgreens, Inc.*, No. 13–14107, 2015 WL 778179, at *7 (E.D.Mich. Feb. 24, 2015). McNamara's May 18 and 19 e-mails to Saunders, Phillippe, and Halley reporting Holzer's anti-kickback violations thus at least superficially constitute protected activity.

As McNamara asserts, an employee need not complete an investigation into potential fraud or uncover an actual FCA violation to undertake protected activity. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir.1998). The FCA's anti-retaliation provision protects employees "while they are collecting information about a possible fraud, *before* they have put all the pieces of the fraud together." *U.S. ex rel. Yesudian*, 153 F.3d at 740. Furthermore, the Supreme Court stated in *Graham County Soil & Water Conservation District v. U.S. ex rel. Wilson*, 545 U.S. at 416, 125 S.Ct. 2444, that a plaintiff claiming retaliation under the FCA may engage in protected activity "even if the target of an investigation or action to be filed was innocent." As the

Supreme Court observed, it is well-established among the circuits that proving a violation of 31 U.S.C. § 3729 is not an element of a § 3730(h) retaliation claim. *Id.* at 428 n. 1, 125 S.Ct. 2444. Therefore, it is not automatically fatal to McNamara's claim that she neither pinpointed any Life referrals induced by the jackets or food nor located any fraudulent cost reports submitted to the government as a result of the purported kickbacks.

That being said, these lenient standards for establishing protected activity remain subject to a reasonable belief requirement. This Court held in *McKenzie* that for an internal report to constitute protected activity under § 3730(h), it "must establish some nexus to the FCA to satisfy the 'in furtherance' prong of an FCA claim, by reasonably leading to a viable FCA action." *McKenzie*, 219 F.3d at 517. Under the new version of § 3730(h) extending protection to "lawful acts done ... in furtherance of an action under this section *or other efforts to stop*" a FCA violation, the requirement that conduct could develop into a "viable FCA action" no longer accurately reflects the statutory language. 31 U.S.C. § 3730(h) (emphasis added); *see also Mikhaeil*, 2015 WL 778179, at *7. While the statutory amendment removes *McKenzie*'s requirement that protected conduct could "lead[ ] to a viable FCA action," *McKenzie*'s reasonable belief requirement survives the amendment. Now, a plaintiff's activities must reasonably embody "efforts to stop" FCA violations. 31 U.S.C. § 3730(h). The Seventh Circuit's test for protected activity enunciates this reasonableness standard by providing that an employee's investigation into alleged fraud is protected only where: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the

government." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir.2004); *see also Wilkins v. St. Louis Hous. Authority*, 314 F.3d 927, 933 (8th Cir.2002); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir.2002). Therefore, although McNamara need not establish that Holzer actually violated the FCA, she must show that her allegations of fraud grew out of a reasonable belief in such fraud.

### 2. Anti-kickback Violation

McNamara claims her e-mails to Holzer senior management constitute protected activity under § 3730(h) because they alleged violations of the AKS that also violated the FCA. AKS violations can constitute FCA violations where a claim submitted to the government for reimbursement includes items or services resulting from a violation of the AKS, 42 U.S.C. § 1320a–7b(g), or where cost reports submitted to the government for reimbursement include an express certification that the underlying claims comply with the AKS, *see, e.g., U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312–13 (3d Cir.2011). McNamara's theory—as far as we can tell—is that Life was submitting claims to the federal government that violated the FCA by seeking reimbursement for ambulance services procured from Holzer through illegal bribes: namely, jackets and hot dogs. ID # 900, 1219 (sealed). McNamara thus attempts to establish her internal report's required connection to fraud based on an underlying AKS violation, giving rise to the issue whether McNamara reasonably believed Holzer accepted illegal kickbacks or bribes under the AKS.

The AKS prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or kind … in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(1)(A). The statute defines "remuneration" as "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a–7a(i)(6). The statute does not, however, define the phrase "in return for." Yet courts widely agree that the " 'gravamen of Medicare fraud is inducement.' " *See, e.g., U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F.Supp.3d 773, 777 (S.D.Ohio 2014) (quoting *Polk Cnty., Tex. v. Peters*, 800 F.Supp. 1451, 1455 (E.D.Tex. 1992)).

While not binding, the Office of the Inspector General ("OIG") for the Department of Health and Human Services ("HHS") has offered further guidance on the meaning of "remuneration" and "induce." The OIG indicated in its Program Guidance for Ambulance Suppliers that the term "remuneration" means "virtually anything of value" including goods, meals, and gifts. OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed.Reg. 14245, 14252 (Mar. 24, 2003). Several courts have affirmed this expansive understanding of remuneration as " 'anything of value in any form whatsoever.' " *United States v. The Health Alliance of Greater Cincinnati*, No. 1:03–CV–00167, 2008 WL 5282139, at *7 (S.D.Ohio Dec. 18, 2008) (quoting OIG Anti–Kickback Provisions, 56 Fed.Reg. 35952, 35958 (July 29, 1991)); *see also United States v. Shaw*, 106 F.Supp.2d 103, 114 (D.Mass.2000). Based on the broad meaning of remuneration, the OIG recommends that ambulance suppliers not offer gifts "of greater than nominal value to referral sources," but indicates that "token gifts used on an occasional basis to

demonstrate good will or appreciation (e.g., logo key chains, mugs, or pens) will be considered nominal in value." OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed.Reg. at 14252. The OIG explained the term "induce" as the necessary intent "to lead or move by influence or persuasion." OIG Anti–Kickback Provisions, 56 Fed.Reg. 35952, 35938 (July 29, 1991). Although the term "induce" applies to the party offering or paying remuneration, it sheds light on the meaning of the phrase "in return for," which applies to the recipient of remuneration, implying that the recipient must be duly induced or "move[d]." *See* 42 U.S.C. § 1320a–7b(1), (2).

An important aspect of inducement is that the remuneration be directed towards an individual or entity "in a position to generate Federal health care program business." *See* OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed.Reg. 4858, 4864 (Jan. 31, 2005). In *U.S. ex rel. Perales v. St. Margaret's Hospital*, 243 F.Supp.2d 843, 852–54 (C.D.Ill. 2003), referrals to a hospital by a nurse working for a physician who entered into an illegal referral agreement with the hospital did not violate the FCA because the referring nurse received no remuneration for her referrals. Thus, any claims submitted to the government as a result of the nurse's referrals were not tainted by an illegal inducement under the AKS. *Id.* at

854. As the court explained, the AKS "contemplate[s] that the person receiving the inducement is the one prohibited from making the referral to the entity that offered the remuneration." *Id.*

In short, a kickback violation entails 1) remuneration to a person or entity in a position to refer Federal health care program patients 2) that could reasonably induce the person or entity to refer such patients. *See* OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed.Reg. at 4864. McNamara must demonstrate the reasonableness of her belief that these elements existed in Holzer's relationship with Life.

### 3. Application to McNamara's Investigation and Internal Reports

Even if we assume that McNamara had a subjective, good faith belief that Holzer employees accepted remuneration as an inducement to refer patients to Life, this belief was not objectively reasonable based on the facts in McNamara's knowledge [4] at the time she reported AKS violations to other upper management. *See Fanslow*, 384 F.3d at 480 (articulating the reasonableness requirement for protected activity as containing a subjective and objective component). Two circumstances make this conclusion clear.

First, McNamara identified only two gifts delivered to Holzer employees—one jacket [5] and some hotdogs and hamburgers

---

**4.** McNamara submitted additional evidence of the alleged kickback arrangement between Holzer and Life in the form of declarations from Life employees Teresa and William Paugh. Because McNamara brings a claim for retaliation under § 3730(h) and not a qui tam action under § 3729, only the evidence in McNamara's knowledge at the time of her investigation and internal reports are relevant for purposes of assessing whether she was engaged in protected activity. To the extent the Paugh declarations contain allegations be-

yond what McNamara heard and communicated in her e-mails, they will be disregarded.

**5.** The dissent portrays McNamara's belief of AKS violations as based on gifts of multiple jackets, noting that Baker's e-mail stated, "SEVERAL people got them," ID # 4894, and that McNamara testified Dr. Mickunas told her "he knew of a few people that had" jackets, ID # 880–81. The record, of course, contains no evidence outside McNamara's subjective mindset to support these statements. Not only did McNamara admit she

at an annual health and wellness fair. It cannot plausibly be suggested that one jacket valued at $23.50, ID # 2358, and occasional servings of hotdogs and hamburgers, ID # 4888–90, could induce a reasonable person to prefer one provider over another. In fact, these items represent such a low monetary value they can only be characterized as "token" gestures of good will under OIG guidance. Yet McNamara claims that *all* free food and gifts are an inducement for patient referrals, citing to a settlement between the OIG and two physicians who allegedly accepted Miami Dolphins football tickets and meals from a medical equipment supplier in exchange for referrals. Appellant Reply Br. 5–6 (citing an expert report that describes the settlement, reported at the OIG's website archives, http://oig.hhs.gov/reports-and-publications/archives/enforcement/kickback_archive.asp# 2006, as an example of an AKS violation resulting in an enforcement settlement).

Indeed, some cases have ruled that free food and drinks can operate as an inducement for referrals, but in those cases the amount and quality of food provided far exceeded Life's annual provision of hotdogs and hamburgers to a miscellaneous set of Holzer employees at a health fair. *See United States v. Perlstein,* 632 F.2d 661, 662–63 (6th Cir.1980) (affirming conviction of nursing home administrator under the AKS for accepting cash payments and $416/month in alcoholic beverages in exchange for Medicaid business referrals); *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.,* 50 F.Supp.3d 497, 515 (S.D.N.Y. 2014) (denying a motion to dismiss a qui tam complaint alleging the provision of food to physicians at multiple lavish speaker events); *U.S. ex rel. Bergman v. Abbot*

*Labs.,* 995 F.Supp.2d 357, 375 (E.D.Pa. 2014) (denying a motion to dismiss a qui tam complaint alleging the provision of meals and sham honoraria funds to encourage physicians to prescribe a drug for off-label uses). For example, the court in *U.S. ex rel. Bilotta v. Novartis Pharmaceuticals Corp.,* 50 F.Supp.3d at 515, denied a motion to dismiss a complaint alleging underlying AKS violations in the form of "sham speaker events" for doctors that "constituted upscale, all-expense paid social outings" at sports bars and restaurants. The complaint alleged the defendant had "spent exorbitant amounts of money ... at both the macro level and at the individual event level." *Id.* Life's provision of hotdogs and hamburgers at an annual employee health fair bears no resemblance to the gifts provided in these cases. Indeed, it is ludicrous to believe that a person would be tempted to make illegal referrals in exchange for a couple hotdogs once a year. McNamara herself must have recognized the token nature of the food items because she nonetheless allowed the event to proceed.

Second, and more importantly perhaps, McNamara presented no evidence to suggest a connection between the gifts and the Life referrals. As indicated by the OIG guidance and *U.S. ex rel. Perales,* remuneration cannot induce a referral unless it is directed towards a person with the power to make referrals. McNamara did not identify a single employee with authority to make referrals to Life, let alone one who also attended one of Holzer's employee wellness fairs and consumed a Life-sponsored hotdog or hamburger. The only specific person McNamara confirmed received anything from Life was Dr. Mickunas, who admit-

discovered only one such jacket but Baker herself testified that she never saw a Life jacket. ID # 4673, 4701. Dr. Mickunas also

testified he did not recall anyone else in Holzer's Emergency Room wearing a Life jacket. ID # 4592, 4599.

ted to receiving a $23.50 embroidered jacket from Life. ID # 4590. Although McNamara claimed that doctors (like Dr. Mickunas) made the ultimate decision about which ambulance provider to call, she never produced the testimony or affidavit of any Holzer doctor verifying this understanding. ID # 859. In fact, Dr. Mickunas contradicted this belief when he testified that Holzer's Emergency Room doctors rarely call ambulance companies to request a patient transport; according to him, a nurse or secretary typically performs that function.[6] ID # 4584–85. Baker, too, testified that Emergency Room nurses called the ambulance service. ID # 4678, 4690. Yet McNamara identified no nurse or secretary who accepted gifts from Life. At the time McNamara made her initial reports to Holzer management, the basis for her belief in anti-kickback violations turned on her unquestioned, unconfirmed, and thus unreasonable assumption that Dr. Mickunas and other doctors not only had the authority but in fact routinely made the decision to refer business to Life in knowing and willful return for illegal kickbacks.

McNamara also attempts to demonstrate a connection between the gifts and referrals by relying on the statistics indicating Holzer called Life more than ninety percent of the time between January and April 2010. McNamara did not possess this knowledge when she first communicated anti-kickback allegations to Holzer management in the May 18 and 19 e-mails. Sometime after making these initial reports, McNamara analyzed the patient transport records and discovered the ninety percent referral rate to Life, at which point she considered her investigation complete. But that statistic is somewhat explained by Holzer's preferred supplier agreement with Life, an agreement McNamara knew about and believed to be legal.[7] Yet McNamara did not show that her concededly complete investigation made any attempt to determine whether the ninety percent referral rate was traceable to the preferred supplier agreement versus the purported illegal kickbacks.[8] McNamara instead fixates on the fact that Life's facility was located farther from Holzer than competing ambulance companies as the denouement of her belief that the preference for Life was illegally motivated. Appellant Br. 7. But, as Dr. Mickunas pointed out, the choice of an ambulance company is based on multiple factors, including distance, availability, weather, and willingness to come. ID # 4596–97. Other factors likely include reliability, quality of service, cost to the patient, proximity to Holzer's other hospitals and care centers, and whether the ambulance was needed for an emergency or non-emergency transport. McNamara never bothered to investigate whether Life might have been receiving

6. The dissent contends that Dr. Mickunas' testimony about referral practices is "beside the point" in determining the reasonableness of McNamara's belief that Holzer was violating the AKS. Dissent at 407. This analysis ignores the objective component of the protected activity standard. Because the reasonable belief standard governing protected activity includes an objective component, evidence outside McNamara's subjective point of view is not only on point but absolutely essential to assessing the reasonableness of her belief.

7. McNamara does not argue that Life procured its preferred supplier agreement through illegal kickbacks.

8. Although McNamara conducted some investigation into Life's and MedFlight's respective credentials, ID # 3162–71, 4907, McNamara testified that these efforts focused on evaluating the wisdom of a preferred supplier agreement with Life—not discerning whether the referral statistics supported an underlying kickback arrangement. ID # 858, 862.

the bulk of Holzer's business because it provided the best and most reliable service, and apparently she never intended to do so since, according to her, she completed her anti-kickback investigation.[9]

The dissent argues "[i]t is the province of a jury" to assess whether McNamara's belief was reasonable and to weigh her failure to conduct a sensible investigation. Dissent at 406–07. There may be a jury question as to McNamara's subjective, good faith belief, but there is no proof in the record to establish that McNamara's belief was objectively reasonable. In concluding the paltry evidence McNamara presents could justify a jury finding that she *reasonably* believed Holzer committed fraud, the dissent conflates the subjective and objective components of the test for protected activity and diverges from our understanding of "objective reasonableness." An objectively reasonable belief requires facts that exist independently of the plaintiff's personal, interior mentality. McNamara produces very few such independent facts to support her belief of anti-kickback violations, and those she does produce do not make her belief reasonable. A jury could not find McNamara engaged in protected activity when she based her allegations of illegal kickbacks solely on a high referral rate to a contractually (and legally) preferred supplier who gave a token jacket and hotdogs to unidentified Holzer employees that may or may not have had referral power.

In conclusion, because McNamara cannot meet her burden of demonstrating the reasonableness of her belief that Holzer violated the AKS, she cannot show she had a reasonable belief that Holzer presented or caused false claims to be presented in violation of the FCA. McNamara failed to create a genuine issue of material fact that her actions constituted protected activity. On this basis, we hold that summary judgment was properly granted to Holzer.

Because we conclude that McNamara did not engage in protected activity, we need not address the parties' arguments on the remaining elements of McNamara's prima facie case. *See Yuhasz*, 341 F.3d at 566–68 (dismissing a FCA retaliation claim for plaintiff's failure to demonstrate just one element of his prima facie case). We similarly decline to address whether McNamara produced direct evidence of Holzer's retaliatory motive because an employer cannot engage in forbidden retaliation without an employee's participation in activity protected by law. Because McNamara has not established a prima facie case, it is also unnecessary to address pretext.

## CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.

KAREN NELSON MOORE, Circuit Judge, dissenting.

I dissent because Sara Jones–McNamara ("McNamara") established a prima facie case of retaliation and presented sufficient evidence to suggest that Holzer Health Systems's ("Holzer") reasons for firing her were pretextual. I would therefore vacate the district court's entry of summary judgment and remand for trial.

---

9. The dissent also attempts to reinforce the statistics by emphasizing McNamara's understanding of an anecdote relayed by Baker about a patient who died after a transportation delay because the nurse in the ER called Life instead of the closer ambulance service. Dissent at 407–08 (quoting ID # 875–76). McNamara's subjective belief that this anecdote raised an anti-kickback issue with Life, however, is not only unsupported but subverted by external evidence: Baker stated in her deposition that it was MedFlight who transported the cardiac patient who had died—not Life. ID # 4668–71.

To establish a prima facie case of retaliatory discharge, McNamara "must show: (1) [s]he engaged in a protected activity; (2) h[er] employer knew that [s]he engaged in the protected activity; and (3) h[er] employer discharged or otherwise discriminated against [her] as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). The majority rests its decision on the first prong. Although it is undisputed that McNamara investigated allegations of kickbacks and reported her findings to Holzer officials, R. 102–36 (McNamara Email, 5/18/2010 at 1) (Page ID # 4904); R. 102–37 (McNamara Email, 5/19/2010 at 1–2) (Page ID # 4906–07), the majority finds that these actions were not protected because McNamara did not have "a reasonable belief in [Anti–Kickback Statute ("AKS"), 42 U.S.C. § 1320a–7b] or [False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*] violations." Maj. Op. at 398.

As the majority recognizes, internal reports that "allege fraud on the government" constitute protected activity under 31 U.S.C. § 3730(h). *See McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir.2000); 31 U.S.C. § 3730(h) (effective July 22, 2010) (protecting "lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section *or other efforts to stop 1 or more violations of this subchapter*") (emphasis added). These reports, however, must "be reasonably connected to the FCA, which was designed to encourage and protect federal whistleblowers." *McKenzie*, 219 F.3d at 515. The majority is therefore correct that investigating and internally reporting on allegations of fraud on the government will be protected if " '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the govern-

ment.' " Maj. Op. at 399–400 (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir.2004)). This belief need not ultimately be correct, *Graham County Soil & Water Conservation District v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 & n. 1, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005), and employees retain protection from retaliation "while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir.1998). Accordingly, the objective component of the inquiry considers the reasonableness of the employee's belief based upon the facts available to the employee at the time. *See Fanslow*, 384 F.3d at 480–81 (reversing grant of summary judgment where the record was "unclear" as to whether the employee had the requisite belief "at the time of his investigation and whether a reasonable employee in these circumstances would have thought the same"). A belief that ultimately turns out to be incorrect may nonetheless have been objectively reasonable in the midst of an investigation, based on incomplete facts.

McNamara's belief that she was investigating fraud under the FCA was based upon a belief that she had uncovered a violation of the AKS, which prohibits the receipt of remuneration as inducement for referral of an individual for federally funded health care services. *See* 42 U.S.C. § 1320a–7b(b)(1). As the majority recognizes, remuneration under the AKS may be " 'anything of value in any form whatsoever,' " *United States v. The Health Alliance of Gtr. Cincinnati*, No. 1:03–CV–00167, 2008 WL 5282139, at *7 (S.D.Ohio Dec. 18, 2008) (quoting OIG Anti–Kickback Provisions, 56 Fed.Reg. 35952, 35958 (July 29, 1991)), yet the majority holds that the items McNamara learned about were of such little value that an investigator could

never have a reasonable *belief* in the existence of *possible* inducement, Maj. Op. at 400–03. The majority continues that inducement under the AKS exists when that remuneration is provided with the intent "'to lead or move by influence or persuasion,'" Maj. Op. at 401 (quoting OIG Anti-Kickback Provisions, 56 Fed.Reg. 35952, 35958 (July 29, 1991)), and is "directed towards an individual or entity 'in a position to generate Federal health care program business,'" *id.* (quoting OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed.Reg. 4858, 4864 (Jan. 31, 2005)), but the majority finds unreasonable McNamara's belief that the items were being given to doctors with authority to refer business to Life Ambulance ("Life") because McNamara did not sufficiently investigate the issue, *id.* at 402–03. But McNamara need not prove that an actual violation of the AKS occurred. *See Graham Cnty.*, 545 U.S. at 416 n. 1, 125 S.Ct. 2444 (holding that "proving a violation … is not an element of a § 3730(h) cause of action"). The question is much more tentative: Did she put forth evidence from

which a jury could find that she had an objectively reasonable belief *as she was conducting the investigation and making her internal reports* that she was "collecting information about a possible fraud." *Yesudian*, 153 F.3d at 740. I would conclude that she did.

Baker reported to McNamara in May 2010 that Life had given jackets with its logo on them "to certain hospital ER doctors," stated that "SEVERAL people got them,"[1] and noted concerns with Holzer using Life frequently, given that "Life Air [was] more than double the distance and time" from Holzer than MedFlight. R. 102–31 (Baker Email) (Page ID # 4894); *see also* R. 50–1 (McNamara Dep. at 200:21–201:10) (Page ID # 875–76) (describing a situation in which a patient had been transported from Holzer to another facility and "had died, and reportedly, the doctors were upset because there was a delay in transport," which Baker attributed "perhaps" to the fact that "the nurse in the ER was forced to not call the closest ambulance but to call Life").[2] Soon after,

1. The majority treats the issue as involving only one jacket, Maj. Op. at 401, and McNamara did testify that she ultimately *confirmed* the existence of only one such jacket, R. 711 (McNamara Dep. at 113:13–114:11) (Page ID # 2358–59), but the report from Baker was not so limited. *See* R. 102–31 (Baker Email) (Page ID # 4894). Moreover, McNamara testified that when she interviewed Dr. Mickunas during her investigation, he said that "he knew of a few people that had" jackets. R. 50–1 (McNamara Dep. at 205:23–206:1) (Page ID # 880–81). The majority brushes aside this information, stating that "[t]he record, of course, contains no evidence outside McNamara's subjective mindset to support these statements," Maj. Op. at 401 n. 5, but the record in fact contains such evidence. McNamara received an email from Baker and testified to having received a statement from Mickunas. Because the objective-reasonableness inquiry judges the reasonableness of an employee's belief based upon the information that was available to the employee *at the time,*

*Fanslow*, 384 F.3d at 480–81 (test is "whether a reasonable employee *in these circumstances* would have thought the same"), these are external sources that a jury could find were sufficient to support a reasonable belief in the midst of an ongoing investigation. That Baker and Mickunas later testified to having no personal knowledge of these additional jackets does not affect the reasonableness of McNamara's reliance on their statements to her unless McNamara knew this additional information at the time. Far from conflating the subjective and objective components of the test, this recognition is necessary to avoid transforming the objective component from requiring an objectively reasonable belief to an objectively correct belief.

2. As the majority notes, Maj. Op. at 404 n. 9, Baker testified during her deposition that it was a different ambulance provider that had been responsible for the transportation of the patient who died. *See* R. 100–1 (Baker Dep. at 29:2–31:18) (Page ID # 4669–71). But Bak-

McNamara learned that Life had also provided free hot dogs and hamburgers for barbeques at Holzer's health and wellness fair. R. 105 (Sealed McNamara Notes at 5) (Page ID # 5139); *see also* R. 102–26 (2010 Health Fair Notice) (Page ID # 4889); R. 102–28 (2009 Health Fair Notice) (Page ID # 4891). After sending her May 18 and May 19 emails to Holzer officials regarding her concerns, McNamara determined that from January to April 2010, Holzer used Life Ambulance more than 90 percent of the time an ambulance company was used to transport patients. R. 102–29 (Chart) (Page ID # 4892).[3] She then reported these figures to Holzer CEO Brent Saunders. *See* R. 50–1 (McNamara Dep. at 347:10–23) (Page ID # 1005). From these facts, a jury *could* find that it was reasonable for McNamara to conclude that it was *possible* that Holzer was "receiv[ing] ... remuneration ... in return for referring" its patients to Life Ambulance. 42 U.S.C. § 1320a–7b(b)(1). The majority notes decisions finding an FCA or AKS violation that involved more expensive food and drinks, Maj. Op. at 402, but the issue in this case is whether McNamara had, during the course of an incomplete investigation, a reasonable belief in the possibility of a violation. It is the province of a jury to weigh the value of the items given, Holzer's near-exclusive use of Life, the reasons why Life was arguably not the best choice, and any other relevant

facts to assess the reasonableness of McNamara's belief.

It is also for a jury to determine the reasonableness of McNamara's understanding that it was "the call of the doctor" to decide which ambulance provider to use, R. 50–1 (McNamara Dep. at 184:3–14) (Page ID # 859)—and therefore that remuneration to doctors could induce a referral. The testimony of others that doctors did not usually refer in this manner, R. 99–1 (Mickunas Dep. at 27:17–28:6) (Page ID # 4584–85), is beside the point. The issue is whether the information available to McNamara at the time could support a finding that she reasonably believed that the individuals she suspected were receiving remuneration from Life were in a position to refer business to Life. McNamara's understanding that doctors were given referral authority was bolstered by the information she received from Baker that Life was giving jackets to doctors and receiving business from Holzer that Baker believed was unwarranted, R. 102–31 (Baker Email) (Page ID # 4894), including one situation in which a patient had died after a transportation delay, which Baker attributed "perhaps" to the fact that "the nurse in the ER was forced to not call the closest ambulance but to call Life." R. 50–1 (McNamara Dep. at 200:21–201:10) (Page ID # 875–76). McNamara's suspicion was also supported by her later discovery that Life received over 90 percent of Holzer's business. *See* R. 102–29 (Chart) (Page ID # 4892).[4] The majority criticizes McNa-

---

er's email to McNamara did not mention this fact and McNamara's testimony indicates that Baker told her that Life was the provider. The majority treats this as constituting an unreasonable belief as a matter of law because McNamara may ultimately have been incorrect, but the issue, again, is whether a jury could find that her belief *at the time,* given the information available to her, was objectively reasonable.

**3.** The majority emphasizes that Holzer had a preferred-supplier agreement with Life, as a

likely explanation for the disparity. Maj. Op. at 403. Even so, McNamara testified that the choice of whom to call remained nonetheless in the hands of the doctor. *See* R. 50–1 (McNamara Dep. at 184:3–14) (Page ID # 859).

**4.** Although McNamara learned these statistics after her May 18 and May 19 emails, she reported them to Brent Saunders in person.

mara for "never produc[ing] the testimony or affidavit of any Holzer doctor verifying this understanding," Maj. Op. at 403, but such evidence—although certainly helpful to her case—is not necessary to avoid summary judgment in light of other evidence that provides an arguable basis for McNamara's belief. McNamara need not prove a violation of the False Claims Act, so long as her belief arising during the course of her investigation was objectively reasonable. *See Graham Cnty.*, 545 U.S. at 416 & n. 1, 125 S.Ct. 2444; *Yesudian*, 153 F.3d at 740.

McNamara's belief arose in the context of an apparently ongoing investigation,[5] and was not unreasonable as a matter of law. Her failure to investigate further, then, is not a basis for summary judgment, even if it could convince a jury that she could not have reasonably believed that anyone was being induced. The majority states: "A jury could not find McNamara engaged in protected activity when she based her allegations of illegal kickbacks solely on a high referral rate to a contractually (and legally) preferred supplier who gave a token jacket and hotdogs to unidentified Holzer employees that may or may not have had referral power." Maj. Op. at 404. But a jury could find that she engaged in protected activity because her allegations were based upon that high referral rate, a report that the supplier was giving jackets to various doctors and obtaining referrals despite arguably being an inferior option, and McNamara's separate

understanding (bolstered by these facts) that doctors did have referral power. A jury could, of course, find that McNamara's belief was not objectively reasonable—either because the jackets and food were of too little value to signify a potential inducement or because her understanding of doctors' referral authority was unreasonable absent further investigation at that time. But it is not our job at the summary-judgment stage to decide these fact disputes.

I would therefore hold that McNamara demonstrated a sufficient basis for a jury to find that her belief that she was investigating a possible AKS violation was reasonable. McNamara also demonstrated a basis from which a jury could infer that she reasonably viewed that suspected AKS violation as an FCA violation, thereby triggering the protections of § 3730(h). Although AKS violations are not always FCA violations, "[a] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a–7b(g). McNamara testified that, at the time of the investigation and internal reporting, she "didn't know if we were billing for these patients that flew, or the ambulance company was, or if we billed for part of them and they billed part of them." R. 50–1 (McNamara Dep. at 226:24–227:2) (Page ID # 901–02). At least, her belief that Holzer might bill Medicare directly for ambulance services

---

*See* R. 50–1 (McNamara Dep. at 347:10–23) (Page ID # 1005).

5. McNamara testified that her investigation was "stopped," but then indicated that she "completed the anti-kickback violation" but "did not complete the investigation of the—the emergency room issues." *See* R. 50–1 (McNamara Dep. at 188:18–189:18) (Page ID # 863–64). Later, she testified again that her investigation had been "interrupted." *Id.* at 202:16–204:18 (Page ID # 877–79). She later

stated that the investigation concluded when she "showed Mr. Saunders the chart ... showing that we had, in fact, been using [Life] six times more than others." *Id.* at 347:16–20 (Page ID # 1005). In any event, her investigation remained unfinished at the time she engaged in the activity she claims was protected—reporting regarding what she viewed as AKS violations and looking into the issues she had uncovered.

was not unreasonable as a matter of law. If Holzer was billing Medicare for those services, that could have provided a basis for an FCA violation because Holzer would have been making a claim to the federal government for services tainted by an AKS violation. The record does not reveal when McNamara learned that Holzer does not actually bill Medicare for services provided by Life, R. 51–1 (McNamara Sealed Dep. at 246:18–21) (Page ID #1219), and thus does not compel a finding that McNamara lacked a belief in the existence of an AKS violation at the time of her investigation and reports, or that such a belief would have been unreasonable. McNamara therefore has created a genuine issue of fact as to whether her actions were protected under § 3730(h). Because the majority's affirmance of the district court's grant of summary judgment to Holzer is based solely on a finding that McNamara's investigative and reporting activity was not protected, I respectfully dissent.

McNamara also demonstrated genuine issues of fact relevant to the other elements of a prima facie case under § 3730(h). She pointed to sufficient evidence that she put Holzer on notice that

she was undertaking activities to stop an FCA violation.[6] McNamara additionally has pointed to sufficient evidence to create a genuine dispute whether her FCA investigation was the but-for cause of her termination.

Finally, McNamara has created a genuine dispute of material fact whether Holzer's asserted reasons for firing her were pretextual. It bears emphasizing that Holzer articulated primarily subjective reasons for McNamara's termination—that she was not a "good fit." We have held "that decisions made on the basis of subjective criteria, such as whether an employee is an effective manager, can provide a ready mechanism for discrimination, and thus such decisions are carefully scrutinized." *Idemudia v. J.P. Morgan Chase*, 434 Fed.Appx. 495, 504 (6th Cir.2011) (internal quotation marks omitted). McNamara did sufficiently dispute whether three of the asserted reasons had a basis-in-fact or were sufficient to warrant her termination. Beyond that, McNamara pointed to other evidence to suggest that Holzer's articulated reasons were pretext. First, she produced evidence that creates a

6. Our decision in *Yuhasz*, 341 F.3d 559, interpreted § 3730(h) before it was amended and therefore *Yuhasz*'s interpretation of the notice requirement does not control this case. In *Yuhasz*, we held that a plaintiff had failed to allege that he satisfied the notice requirement of an FCA retaliation claim because his normal job duties involved investigating potential fraud. *Id.* at 567. We explained that "[i]n light of their ordinary responsibilities, however, such persons [employees charged with investigating potential fraud] must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Id.* at 568 (internal quotation marks omitted). Given that the current version of § 3730(h) no longer limits protected activity to actions in furtherance of potential FCA actions, *Yuhasz*'s requirement that em-

ployees involved in investigating potential fraud must "make clear their intentions of bringing or assisting in an FCA action," *id.*, is no longer required by the statutory text. *See, e.g., Mikhaeil v. Walgreens Inc.*, No. 13–14107, 2015 WL 778179, at *9 (E.D.Mich. Feb. 24, 2015) (reasoning that *Yuhasz* no longer applies in light of the amendments to § 3730(h)); *Manfield v. Alutiiq Int'l Solutions, Inc.*, 851 F.Supp.2d 196, 204 (D.Me. 2012) ("Under the new statute, an employer's knowledge still mirrors the kind of activity in which the plaintiff must be engaged. Since a plaintiff now engages in protected conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity.").

genuine dispute whether Holzer failed to follow its own policies in terminating her. We have held that "an employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext." *DeBoer v. Musashi Auto Parts, Inc.,* 124 Fed.Appx. 387, 394 (6th Cir.2005). Second, McNamara argues that "[n]early all of the eight reasons given by Holzer ... were offered for the first time *post-hoc* during this litigation." Appellant Br. at 35. Here, the only record evidence documenting why McNamara was fired *when she was fired* is her employee evaluation form, and the only specific negative feedback on that form is a "Poor" rating for "Situational Leadership." R. 73–2 (Employee Eval. Rep. at 1) (Page ID # 3203). We have held that evidence that an employer's asserted legitimate reasons for firing a plaintiff were concocted after-the-fact can be evidence of pretext. *See, e.g., Gaglioti v. Levin Grp., Inc.,* 508 Fed. Appx. 476, 482 (6th Cir.2012); *Wheet v. Greenwood Ford, Inc.,* No. 96–5368, 1997 WL 589270, at *3–4 (6th Cir. Sept. 23, 1997).

In sum, the evidence that McNamara introduced is sufficient to raise disputes of material fact regarding the elements of a prima facie case of retaliatory discharge and whether Holzer's asserted reasons for terminating her were pretextual. I therefore dissent from the majority's affirmance of the district court's entry of summary judgment.