Helane MILLER, Plaintiff–Appellant,

v.

**ABBOTT LABORATORIES,**
Defendant–Appellee.

No. 15–5762.

United States Court of Appeals,
Sixth Circuit.

May 12, 2016.

BEFORE: ROGERS and WHITE, Circuit Judges; and HOOD, District Judge.*

PER CURIAM.

Plaintiff Helane Miller appeals the grant of summary judgment in favor of Abbott Laboratories ("Abbott") on her False Claims Act ("FCA") retaliation claim. The district court held that Miller did not present a genuine dispute of material fact whether she engaged in protected activity. Because Miller did not have an objectively reasonable belief that she was acting to stop a violation of the FCA, we **AFFIRM.**

---

* The Honorable Joseph M. Hood, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

# I.

## A. Miller's Employment With Abbott

Miller worked at Abbott for more than twelve years in various positions prior to the termination of her employment. She was hired in September of 1999 as an account executive in Abbott's Managed Care Division. She was laid off in November 2008 and rehired in December 2009 as a sales excellence manager in the Pharmaceutical Product Division, where one of her major responsibilities was identifying potential ethical violations by sales representatives. Miller was laid off again in January 2011 and rehired in November 2011 as a sales representative for the Home Health/Oncology department in Abbott's Nutrition Division ("Nutrition sales representative" for "Abbott Nutrition"). As a Nutrition sales representative, Miller was supervised by district manager Bridget Bailey, who reported to Laurence Carbone, a divisional vice president of sales for Pediatric, Home Health, and Oncology.

Abbott Nutrition sells liquid nutritional supplements such as Ensure, Glucerna, and Juven, and equipment and liquid nutrition for tube-feeding patients; it does not sell pharmaceutical products. These nutritional products are used to treat patients with nutritional deficiencies due to old age, cancer, or other illnesses. They are over-the-counter products not reimbursed by Medicare or Medicaid as a matter of course, but only if authorized by a physician.

As a Nutrition sales representative, Miller's performance was judged in part by how many protocols were implemented by healthcare providers such as home-health agencies [1] and oncology clinics. A protocol is a process, pathway, or set of procedures that a healthcare provider creates to improve patient outcomes by identifying and improving nutrition risks in patients. Protocols do not bind the providers to recommend a particular Abbott product, but Abbott's expectation was that the providers would recommend Abbott's products to patients pursuant to the protocols, who would like them and purchase them.

In the fall of 2012, Bailey created a competition for her sales representatives to create and implement the best original protocol, with the winner receiving $100. On October 2, Miller called Karen Curl–Stepney, a customer and former Abbott colleague, who was an executive director at Evangelical Homes of Michigan ("Evangelical"),[2] to discuss implementation of a protocol. According to Miller, Curl–Stepney said that she was aware of the contest because she had spoken with Tom Berry, another Nutrition sales representative reporting to Bailey, when Berry met with Curl–Stepney to provide samples of Abbott Nutrition products. According to Miller, Curl–Stepney stated "Tom told me if I would get cracking on this and do this for him, that he'd give me half the bonus money, $50." [3] (R. 40–2: Miller Dep., PID

---

1. A home-health agency is an agency that provides skilled nursing care to patients in their home. Home-health agencies are often reimbursed by Medicare or Medicaid.

2. Evangelical operates its own communities and also provides home care services for the elderly. Ninety-eight percent of Evangelical's customers were on Medicare during Curl–Stepney's tenure there.

3. According to Curl–Stepney, she told Berry that she was working on a protocol and Berry "jokingly said that if the protocol was really good, he might give [Curl–Stepney] 'a couple bucks.' " (R. 40–10: Curl–Stepney Decl., PID 947.) Curl–Stepney did not believe that Berry was offering a bribe or inappropriate payment, and Berry's joke did not motivate her actions regarding implementing a protocol. She did not move forward with formulating a protocol once she learned that her meeting

362.) Miller's phone call with Curl–Stepney ended abruptly after Miller told Curl–Stepney that she wished Curl–Stepney had not told her that.

Although Miller knew that Curl–Stepney would not accept the payment from Berry, Miller contacted Bailey to report Berry's offer. Bailey responded, "Oh, shit" when informed of the payment offer, and Miller stated that she would call the Office of Ethics and Compliance ("OEC") and file a complaint because this was "quid pro quo." (*Id.* at PID 364.) Miller asserted that the offer had to be reported to the OEC, but Bailey asked that Miller not do so until Bailey could speak with Carbone. After speaking with Carbone, Bailey told Miller that Bailey would make the complaint to the OEC and then confront Berry about the payment offer later that week, in addition to contacting Curl–Stepney. Miller objected to Bailey's initiating her own investigation, asserting that it was improper and would cause tension with Miller's co-workers, and reiterated that Berry's offer was a "serious infraction." (*Id.* at PID 365, 366.) Curl–Stepney then called Miller back and stated that she did not believe Berry was serious with the offer and expressed concern that her employer might find out about the investigation.

On October 3, Bailey reported the incident to the OEC, which opened an investigation. Miller asserts that she also notified the OEC about Berry's offer and her concerns about Bailey confronting Berry. On October 4, Bailey contacted Curl–Stepney and informed her that a new representative would be assigned to her account. Curl–Stepney told Bailey that she thought Berry's offer was made in jest. On October 5, Bailey met with Berry, who denied making the offer.

The OEC's investigation closed with inconclusive results because Berry denied making the offer and Curl–Stepney would not speak with the OEC. Miller had also informed the OEC that Berry may have been joking. Nonetheless, the OEC found the circumstances suspicious and required Berry to undergo ethical training. On December 6, 2012, the OEC also coached Bailey not to reach out to parties involved in an investigation in the future.[4]

Subsequently, Bailey began documenting problems with Miller's performance, including Miller's failing a required certification exam three times. In September 2013, Abbott terminated Miller's employment, citing her poor performance. Miller disputes many of Bailey's critiques of her performance that were used to justify the termination, and alleges that Bailey constructed a false record of Miller's performance in retaliation for her reporting Berry's offer to Curl–Stepney.[5]

**B. Background About Abbott's and Miller's Awareness of Federal Laws**

In May 2012, Abbott paid $1.5 billion and entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the United States to resolve an investigation into its off-label promotion of a product. The CIA became

with Berry was the subject of an Abbott investigation.

**4.** Bailey was counseled again after Miller filed a report with employee relations in late-January 2013, complaining that she was unhappy with the dynamic on her team and that Bailey had mismanaged Miller's report of Berry's conduct.

**5.** Miller filed a motion "to take notice of facts" requesting the court to take notice of evidence that she argues supports her position that she performed as an adequate Nutrition sales representative in 2013. Because this evidence is only possibly relevant to causation and pretext, we deny the motion as moot because we do not reach those issues.

effective on October 11, 2012. Miller understood that the CIA only applied to Abbott's pharmaceutical product group, but Miller was aware of the CIA and its contents. One of the requirements of the CIA was to establish policies and procedures to ensure compliance with the FCA and Anti–Kickback Statute ("AKS"), as well as other federal laws.

Abbott's Code of Business Conduct acknowledges that many of its customers depend on Medicare and Medicaid and states that it is committed to full compliance with all federal healthcare program requirements, including the FCA and AKS. The Code of Business Conduct also summarized those laws, explaining that the federal AKS "prohibits offering or paying (or soliciting or receiving) cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program." It described the FCA as prohibiting the knowing or reckless submission of false claims to the government, or causing others to submit false claims. Accordingly, it cautioned that because many of Abbott's customers submit claims for payment to the government, Abbott must follow procedures "carefully designed to ensure that any information we provide to customers about Medicare or Medicaid reimbursement for our products is accurate and otherwise proper." (R. 40–2: Code of Business Conduct, PID 415.)

### C. Procedural History

Miller filed suit against Abbott, alleging retaliation in violation of the FCA, 31 U.S.C. § 3730(h), and wrongful discharge under Kentucky law. Miller later amended her complaint to add a claim of retaliation in violation of the National Defense Authorization Act, 41 U.S.C. § 4712 ("NDAA"). Abbott moved for summary judgment on all claims. The district court granted summary judgment in favor of Abbott on Miller's federal claims, holding that Miller had not presented sufficient evidence that she engaged in protected activity under the FCA because she "failed to establish a nexus or link between the report of the bribe and exposing fraud on the government," and that her NDAA claim failed because the CIA went into effect after Miller's report of Berry's offer and because Miller knew the CIA did not apply to Abbott Nutrition. (R. 46: Mem. Op. & Order, PID 1803–06.) Having dismissed Miller's federal claims, the district court declined to exercise supplemental jurisdiction over the state-law claim and dismissed it without prejudice. Miller appeals only the grant of summary judgment on her retaliation claim under the FCA.

## II.

This court reviews de novo a district court's order granting summary judgment. *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir.2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). In determining whether the district court's grant of summary judgment was proper, the court "must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir.2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### A. FCA Retaliation, In General

The FCA, 31 U.S.C. §§ 3729–3733, prohibits, among other things, any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," and "knowingly mak[ing], us[ing], or caus[ing] to be made

or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA allows the Attorney General or a private person to initiate a civil action alleging fraud on the government. *See* 31 U.S.C. § 3730(a)-(b). A private enforcement action under the FCA is called a qui tam action. *U.S. ex rel. Eisenstein v. City of New York,* 556 U.S. 928, 932, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009). To protect whistleblowers exposing fraud on the government, *see McKenzie v. BellSouth Telecomms., Inc.,* 219 F.3d 508, 513 (6th Cir. 2000), the FCA also contains an anti-retaliation provision:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

In the absence of direct evidence of retaliatory motive, as here, "[t]he familiar *McDonnell–Douglas* burden-shifting framework applies to retaliation claims." *Scott v. Metro. Health Corp.,* 234 Fed. Appx. 341, 346 (6th Cir.2007). To establish a prima facie case under § 3730(h), Miller must prove that she engaged in a protected activity; her employer knew she engaged in protected activity; and the employer discharged or otherwise discriminated against her as a result of the protected activity. *McKenzie,* 219 F.3d at 514. "If a plaintiff establishes a prima facie case of retaliation, the defendant may

rebut the presumption of retaliation by asserting a legitimate, non-[retaliatory] reason for its actions. The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for the employment action is pretextual." *Balmer v. HCA, Inc.,* 423 F.3d 606, 614 (6th Cir.2005) (citations omitted), *abrogated on other grounds by Fox v. Vice,* 563 U.S. 826, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011).

**B. Protected Activity**

Miller argues that she engaged in protected activity when she reported Berry's offer to split the protocol prize money with Curl–Stepney because it was an attempted bribery of a government healthcare provider in violation of the AKS, 42 U.S.C. § 1320a–7b, which could have led to a violation of the FCA. Miller's theory is that Berry's bribe could have induced Evangelical to implement a protocol that included Abbott Nutrition products; pursuant to the protocol, Evangelical would recommend Abbott Nutrition products and provide patients eligible for Medicare or Medicaid free samples or coupons for Abbott Nutrition products; the patients would then purchase Abbott Nutrition products and seek to have Medicare or Medicaid reimburse a portion of the costs of the products. Miller alleges that this would be a violation of the FCA because the resulting claim for reimbursement would have been the result of a kickback. *See infra* Section II.B.2.

**1. Standard for Protected Activity Under the FCA**

In *McKenzie,* 219 F.3d at 516, this court held that internal reports of fraud may constitute protected activity so long as they "allege activity with a nexus to a *qui tam* action, or fraud against the United States government." The anti-retaliation

section interpreted in *McKenzie* was amended in 2009 by expanding the subsection to also protect "other efforts to stop 1 or more violations of" the FCA, rather than only conduct that was in "furtherance of an action under" the FCA.[6] *See Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir.2012); *see also* 155 Cong. Rec. E1295–03, E1300 (June 3, 2009) (statement of Rep. Berman) ("This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual qui tam action."). Therefore, pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual qui tam action is no longer applicable. *See Jones–McNamara v. Holzer Health Sys.*, 630 Fed.Appx. 394, 399 (6th Cir.2015) ("[T]he requirement that conduct could develop into a 'viable FCA action' no longer accurately reflects the statutory language."). The amended statutory language also explicitly confirms *McKenzie*'s recognition that § 3730(h) protects internal reports of, or other efforts to stop, fraud on the government. *See McKenzie*, 219 F.3d at 515.

To constitute protected activity, "an employee need not complete an investigation into potential fraud or uncover an actual FCA violation" because the FCA's anti-retaliation provision protects employees while they are merely collecting information about potential fraud. *Jones–McNamara*, 630 Fed.Appx. at 399 (citing *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416, 125 S.Ct. 2444, 162 L.Ed.2d 390, (2005); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir.1998)). However, an employee's activities "must reasonably embody 'efforts to stop' FCA violations." *Id.* (quoting 31 U.S.C. § 3730(h)). Accordingly, consistent with other circuits, this court has explained that "although [the plaintiff] need not establish that [the employer] actually violated the FCA, she must show that her allegations of fraud grew out of a reasonable belief in such fraud." *Id.* at 400; *see also Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 71 (D.C.Cir. 2008) (holding that employee must have subjective, good-faith belief and objectively reasonable belief that fraud is being committed against the government); *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir.2004) (same); *Wilkins v. St. Louis Hous. Authority*, 314 F.3d 927, 933 (8th Cir.2002) (same); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir.2002) (same).

### 2. The Anti–Kickback Statute

The AKS provides criminal penalties for anyone who

knowingly and willfully offers or pays any remuneration (including any kick-

---

**6.** The pre-amendment anti-retaliation provision stated the following:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.
31 U.S.C. § 3730(h) (2006).

A slightly different version of the current statute was in effect from March 2010 to July 2010. *See Jones–McNamara v. Holzer Health Sys.*, 630 Fed.Appx. 394, 397 n. 3 (6th Cir. 2015).

back, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

42 U.S.C. § 1320a–7b(b)(2).

"AKS violations can constitute FCA violations where a claim submitted to the government for reimbursement includes items or services resulting from a violation of the AKS, or where cost reports submitted to the government for reimbursement include an express certification that the underlying claims comply with the AKS." *Jones–McNamara*, 630 Fed.Appx. at 400 (citations omitted); *see also* 42 U.S.C. § 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].").

"Remuneration" includes "transfers of items or services for free or for other than fair market value." 42 U.S.C.A. § 1320a–7a. The Office of the Inspector General for the Department of Health and Human Services has offered further guidance that items or services of nominal value are permitted under the AKS because those items or services could not reasonably be expected to induce a referral. *See* 68 Fed. Reg. 14245, 14252 (Mar. 24, 2003); 65 Fed. Reg. 24400, 24411 (Apr. 26, 2000). "An important aspect of inducement is that the remuneration be directed towards an individual or entity in a position to generate Federal health care program business." *Jones–McNamara*, 630 Fed.Appx. at 401 (internal quotation marks and citation omitted). "In short, a kickback violation entails 1) remuneration to a person or entity in a position to refer Federal health care program patients 2) that could reasonably induce the person or entity to refer such patients." *Id.*

### 3. Application to Miller's Claim

In *Jones–McNamara*, the plaintiff, a vice president of corporate compliance for the defendant healthcare-delivery system, began investigating allegations that the defendant's dealings with an ambulance company ("Life") violated the AKS. 630 Fed. Appx. at 395. The plaintiff was informed that certain ER doctors received embroidered jackets from Life; that the defendant's employees routinely called Life over a competitor that was closer to the defendant's facilities; and that Life had provided free hotdogs and hamburgers to the defendant's employees at health and wellness fairs. *Id.* The plaintiff reported this activity to her supervisors, believing that these actions violated the AKS and FCA because the defendant might have billed Medicare for Life's ambulance services. *Id.* at 395–96. The defendant terminated the plaintiff's employment shortly thereafter. *Id.* at 396.

This court held that the plaintiff failed to establish a genuine dispute of material fact about whether her belief that the defendant's employees accepted remuneration as an inducement to refer patients to Life was objectively reasonable. *Id.* at 404. First, the court reasoned that the plaintiff had only identified two gifts delivered to the defendant's employees—a single jacket valued at $23.50 and some hotdogs and hamburgers—which could not induce a reasonable person to prefer one provider over another. *Id.* at 401–02. Second, the

court explained that the plaintiff "did not identify a single employee with authority to make referrals to Life, let alone one who also attended one of [the defendant's] employee wellness fairs and consumed a Life-sponsored hotdog or hamburger." *Id.* at 402. Thus, because the plaintiff could not meet her burden of demonstrating the reasonableness of her belief that the defendant violated· the AKS, she could not show that "she had a reasonable belief that [the defendant] presented [false claims] or caused false claims to be presented in violation of the FCA." *Id.* at 404.

Like the plaintiff in *Jones–McNamara,* Miller has failed to establish a genuine dispute of material fact about whether she engaged in protected activity. Miller testified that she knew at the time she made her report that Curl–Stepney would never accept Berry's offer. Thus, Miller did not have an objectively reasonable belief that an FCA violation would occur, because she knew that Curl–Stepney would not be induced by the offer of $50 to implement a protocol recommending Abbott's products, and therefore could not reasonably believe that fraudulent Medicare or Medicaid claims would be submitted to the government as a result of an AKS violation involving Berry's bribe. *See id.* at 401–02; *see also McKenzie,* 219 F.3d at 516 ("Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government.").

Miller argues that although she knew that Curl–Stepney in particular would not accept Berry's offer, she could still reasonably believe that reporting Berry's conduct would stop future bribes from being made to less scrupulous medical providers. We need not determine whether this theory saves Miller's claim because Miller's testimony does not support that she held this belief. Nor does she point to any evidence supporting that Berry offered compensation to medical providers in other contexts. Rather, Miller testified that she believed Berry's bribe was a violation of the FCA because any offer of anything of value to a customer violates the FCA if it exceeds the limits provided in Abbott's policies regarding gifts to, meals for, and entertainment of customers. Miller's belief that any offer of anything of value violates the FCA is not objectively reasonable because it does not link Berry's offer to the inducement of a healthcare provider's recommendation of Abbott Nutrition products to federal-program patients, nor to any claims being submitted to the government by those federal-program patients.[7] Because there is nothing in the record suggesting that Miller objectively believed she acted to stop future FCA violations by Berry, Miller has failed to present a genuine dispute of material fact whether she engaged in protected activity.

Finally, to the extent Miller argues that public-policy considerations support reading into the AKS an anti-retaliation provision that would protect her report of Berry's offer, she has not preserved this argument for appeal because she failed to raise it below in support of her FCA retaliation claim, and this new theory would convert her FCA retaliation claim into an entirely different claim. Further, to the

7. We are not suggesting that an employee needs to articulate her belief about an FCA violation in a manner that falls neatly into the legal standards. But the crux of any FCA violation is that a false or fraudulent claim is submitted to the government. Here, Miller's testimony established that no claim would be submitted to the government as a result of Berry's offer because Curl–Stepney would have never accepted the offer, and she provided no basis in her testimony to support her argument that she reasonably believed she was stopping future false or fraudulent claims from being submitted to the government. Without this crucial link, Miller's report is simply not protected by the FCA.

extent Miller argues that public-policy considerations and Supreme Court case law finding implied retaliation provisions in statutes require that her report of Berry's offer be protected under the FCA, we note that the FCA does provide protection from retaliation and there is no need to find an implied remedy. However, the FCA does not purport to protect all reports of wrongdoing, only those that are in furtherance of a qui tam action or other efforts to stop a violation of the FCA.

Given our conclusion that Miller has failed to present a genuine dispute of material fact about whether she engaged in protected activity, we need not address the other prongs required to establish a prima facie case or whether Abbott's proffered reasons for termination were pretextual.

### III.

For these reasons, we **AFFIRM** the judgment of the district court, and **DENY** as moot Miller's motion to take judicial notice.

HELENE N. WHITE, Circuit Judge, dissenting.

I respectfully dissent. Miller reported what she reasonably understood to be an offer of money in exchange for Curl–Stepney's implementing a protocol involving Abbott's products. Had Curl–Stepney accepted the offer and implemented a protocol that promoted an Abbott nutritional product to Medicaid or Medicare patients resulting in claims for reimbursement, an FCA violation would have reasonably resulted. Miller's claim should not depend on the integrity or good judgment of the person to whom the inducement was offered. It was reasonable for her to fear that if the offer went unreported, it might happen again. The fact that she did not articulate her motivation using those words but expressed a more general belief that any offer of consideration was an unlawful "quid pro quo" does not negate the fact that if accepted, the offer could have constituted a violation of the FCA, and that it was objectively reasonable for an employee to believe that reporting such an offer would prevent future violations of the FCA. Moreover, although Miller's understanding of what constitutes an FCA violation was inaccurate, employees are not required to know the intricacies of the FCA, and Miller testified that she thought Berry's offer violated the FCA and AKS. *See McKenzie v. BellSouth Telecomms., Inc.,* 219 F.3d 508, 516 (6th Cir.2000); *U.S. ex rel. Schweizer v. Oce N.V.,* 677 F.3d 1228, 1238 (D.C.Cir.2012). Because the FCA anti-retaliation provision should be interpreted broadly to protect reports intended to prevent fraud on the government, *see McKenzie,* 219 F.3d at 516, I would leave it to the jury to decide whether Miller held an objectively reasonable belief that she was acting to stop an FCA violation.[1]

I would reverse and remand for trial.

---

1. I recognize that Miller has additional hurdles to clear to obtain reversal. Miller established a prima facie case and evidence of pretext by presenting evidence that shortly after her report of Berry's offer, Bailey began unfairly documenting performance issues to construct a record of poor performance that was eventually used to justify her termination, and also denied requested training for a critical certification exam. Because Bailey provided all of Miller's performance evaluations and graded Miller's certification exams, Miller's testimony disputing the accuracy of those assessments creates a genuine dispute

of material fact about whether Miller's employment was terminated because of her report of Berry's offer and whether Abbott's reason for terminating her employment— which was based primarily on Bailey's reports about Miller's performance—was pretextual.