NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0021n.06

Nos. 16-2544

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA ex rel. CARLA CROCKETT,

    Plaintiff-Appellant,

v.

COMPLETE FITNESS REHABILITATION, INC.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

OPINION

BEFORE:    KEITH, ROGERS and McKEAGUE, Circuit Judges.

ROGERS, Circuit Judge. Carla Crockett worked for Complete Fitness Rehabilitation, Inc., a provider of physical rehabilitation services to Medicare patients. She was fired after repeatedly objecting to her supervisor's directives that she provide her patients with more extensive (and profitable) treatments. Crockett sued, claiming various breaches of the False Claims Act (FCA), but the district court dismissed her entire complaint as not meeting Rule 9(b)'s particularity requirements. The court below was correct in dismissing Crockett's claims of FCA violations, given that Rule 9(b) required her to identify fraudulent claims that were actually submitted to the government, and that Crockett did not do so here. However, the district court improperly dismissed Crockett's claim of FCA retaliation—that she was fired for resisting what she believed was a FCA violation—because an FCA retaliation claim does not require a plaintiff to meet the particularity standards of Rule 9(b), and Crockett did allege sufficient facts

to suggest that she reasonably believed her objections would stop an FCA violation. Crockett is therefore entitled to proceed to discovery on her FCA retaliation claim.

## I.

Carla Crockett is a certified occupational therapist. On March 5, 2012, Complete Rehab—a Michigan corporation providing physical, occupational, and speech therapy services—hired her as an Occupational Therapist and Rehab Manager. Crockett worked at a skilled nursing facility in Petoskey, Michigan, that was managed by another entity, Bortz Health Care Facilities ("Bortz"), which is not a party to this suit. In her role as a Rehab Manager at Complete Rehab, Crockett distributed patient caseloads among other therapists, reviewed therapist schedules, and communicated with Complete Rehab's corporate offices, while also maintaining her own caseload of patients. In her job as an Occupational Therapist, Crockett assisted in diagnosing newly admitted patients and determining the medically appropriate level of therapy for each patient.

Crockett's supervisor at Complete Rehab was Pam Ulrey, the Regional Rehab Manager. Ulrey worked in Traverse City, Michigan, and only visited Petoskey about once per week. The other days, Ulrey supervised Crockett remotely, reviewing Crockett's overtime requests, signing off on Crockett's schedules, and providing daily feedback.

The Petoskey facility received patients insured under both Medicare Part A and Part B. As with other rehabilitation facilities, Complete Rehab received patients after a doctor's referral, and those referrals often included a recommendation for a level of therapy to treat that patient's condition. When new patients arrived at Complete Rehab, the facility would review that doctor's referral, but itself independently determine the level of therapy that the facility would provide.

For those Complete Rehab patients covered by Medicare, the facility's decisions about therapy levels formed the basis for claims on the United States through at least two channels. Under Medicare Part A, the hospital insurance program covering most Americans over the age of 65, a facility like Complete Rehab providing skilled nursing services to Medicare Part A patients receives per diem payments from the United States. *See* 42 C.F.R. § 413.335(a). This per diem rate is determined by the level of a patient's medical needs, as periodically determined by a licensed clinical professional during the patient's stay at the facility. 42 C.F.R. § 413.343. As part of this determination, a medical professional assessing a patient will categorize that patient into a Resource Utilization Group ("RUG"). Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2010, 74 Fed. Reg. 40,288, 40,289 (Aug. 9, 2009). For the patients in the "Rehabilitation category" who receive "rehabilitative therapy services," there are five sub-categories of RUGs: "Ultra High, Very High, High, Medium, and Low." Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities, 63 Fed. Reg. 26,252, 26,263 (May 12, 1998). The difference in per diem payment from one RUG sub-category to the next is on the order of $100 per patient per day. *See id.* at 26,258.

Medicare Part B, the supplemental medical insurance program, also pays for medical services for patients who have purchased the insurance and paid the deductible associated with that service. *See* 42 C.F.R. § 410.3. Part B will pay for rehabilitation services at a facility like Complete Rehab, but its benefits are more limited than those available under Part A. *See* 42 C.F.R. § 414.1105. Part B also differs from Part A in that Part B pays facilities on a per-service basis, rather than Part A's per diem fee schedule. *See* 42 C.F.R. § 410.152(b).

Although Complete Rehab treated patients covered by Medicare Parts A and B, the facility did not submit bills directly to the government. Instead, Complete Rehab billed Bortz for any services that it had provided, and Bortz then prepared and submitted claims to Medicare. The record does not contain any evidence as to how or if Bortz used Complete Rehab's bills to Bortz as a basis for Bortz's bills to the government. The record also does not identify any claims actually submitted to the government, either by Bortz or by any other party.

The crux of this case is Crockett's allegation that Complete Rehab had a policy of over-providing treatments to Medicare patients, and thereby receiving greater payments from Medicare than a more limited treatment scheme would have permitted. As Crockett contends, Complete Rehab would code its Medicare Part A patients for ultra-high or very high levels of care, even if it was medically inappropriate to try and deliver the highest frequency of therapy to those patients, and also over-deliver therapy services to Medicare Part B patients. She argues that Complete Rehab would admit and treat its patients at the ultra-high care level, qualifying for ultimately higher per-diem payments under Medicare Part A and higher per-service payments under Medicare Part B, and only downgrade patients to a lower level of medical care when delivery of the higher and more lucrative level of rehabilitation proved impossible.

Throughout Crockett's tenure at Complete Rehab, Crockett and Ulrey quarreled regarding the standard of care delivered to Complete Rehab patients. Crockett has identified various emails between her and Ulrey demonstrating this dispute:

- On April 20, 2012, Ulrey wrote: "If you are planning on upping RUG levels to justify bringing in prn [sic] staff then you should try to maximize level on admission . . . Admit then try[] to ramp up later. It looks to me like you only have 2 UHs [ultra-highs] . . . and 5 VHs [very highs]."

- On August 31, after Crockett's coworker reported that two patients will be at very high: "It has always been our policy to start all med A's at UH and then back down only after every effort is made to provide this highest level of care. I would like you

to email me asap when you are not able to provide the scheduled minutes . . . . We may have to get creative to provide the level of service we have committed to Corp. Bortz."

- On September 11, 2012, when Crockett's co-worker coded new patients at "very high" because they appeared to be too exhausted to handle more intensive care, Ulrey wrote: "you guys need to get out of the mindset of no one ever being UH unless seen by speech as well as OT/PT. These two [patients] only been in your building one day yet you are already certain of their tolerance???? The [diagnoses] you stated do not necessarily indicate lower tolerance. I expect you to give the higher level a better attempt before giving up. This is clearly a pattern in Petoskey and it has not gone unnoticed."

- On September 18: "<u>I will be adjusting the planner to reflect ultra high levels on all Med A's currently on caseload.</u> We have been contacted by corporate Bortz regarding the low RG levels at the Petoskey facility. The lowest out of all the Bortz facilities. I do not believe that Petoskey patients are any less appropriate for UH levels th[a]n any other facility. This is no longer negotiable. You need to be creative. Because of your history of being unsuccessful in getting UH level for almost all of your patients . . . I am going to be much less likely to accept reasons for lower levels. You simply need to try harder."

Ulrey also pressured Crockett to give more treatment to Part B patients and to provide more treatments on weekdays. Crockett has produced more emails from Ulrey to that effect:

- On May 16: "Med B's should be seen for 60 minutes (not 45)."

- On the same day, after Crockett responded that she will complete "the frequency and duration that is clinically necessary" and that "[i]f the Med B patient[]s are appropriate we can increase minutes treated as needed": "OK. Can you tell me why the part B's can't tolerate 15 more minutes/day? It always helps to share the reasons . . . ."

- On May 22: "Please work on the schedule. With caseloads so very low the weekend minutes should be greatly reduced and shifted to weekdays so that you and Rati have a full work day. . . . Part B's should be seen during week and not on the more costly weekends. . . . Better to increase treatment minutes going i[n]to the holiday weekend . . . . Thanks. I really do appreciate your attention to all of this. . . . I am on your side. We just have to consider revenue."

- On August 28, after Crockett reported that a Part B patient was unable to complete the scheduled therapy: "Everything at all possible should have been done to deliver scheduled minutes. This is a huge financial impact on the facility and our company."

Crockett also offered evidence about her resistance to Ulrey's calls for more treatment:

- On May 9, during an email chain about increasing treatment for Part A patients, Crockett stated, "I followed up with team in order to determine what things we could do that is [sic] clinically appropriate." In the same email, Crockett stated, "We . . . thought that it may be best to try to proceed with PT/OT as much as is clinically appropriate in order to decrease the burden of care and improve quality of life."

- On July 29, Crockett wrote, "I would like to officially step down from the position of Rehab Manager, as of September 1st. I have given my reasons in previous correspondence." Those reasons appear to have been discomfort with aggressive treatment that Ulrey sought.

- On September 19, the day after Ulrey's email announcing that all Part A patients will be coded at ultra high, Crockett replied at length: "At the Petoskey site, our team collectively makes professional determinations to establish clinically appropriate RUG levels. As licensed clinicians, it is our obligation to make autonomous skilled judgments that reflect the patients' best interest. Setting all patients at the ultra high level, regardless of medical status, is not appropriate. This is not in alignment with national averages regarding RUG levels. Professional standards require acting with nonmaleficence and veracity. It is my understanding that the Petoskey site has long struggled to be profitable for Complete Rehab. . . . It is in our best interest to increase revenue. I am happy to explore a variety of possibilities with this goal in mind. However, we seem to be at an impasse. I will not suspend my clinic responsibilities to our patients. I cannot comply with your request to have all Med A's in Ultra High, but I will work with veracity to work hard to be creative for this goal."

Days after that final email, on September 28, Ulrey fired Crockett. In total, Crockett's employment at Complete Rehab lasted half a year.

Crockett filed this *qui tam* suit on May 29, 2013, pursuant to the FCA. *See* 31 U.S.C. § 3729. The FCA imposes significant civil penalties on a person or entity which "knowingly presents, or causes to be presented, a false or fraudulent claim" to the government "for payment or approval," *id.* § 3729(a)–(b). The FCA also allows private individuals, known as relators, to sue on behalf of the government, and although the government has the right to intervene and prosecute a suit itself, a relator may continue the action on her own if the government declines to intervene. *See id.* § 3730(b). In this case, the United States investigated Crockett's complaint

for two and a half years, then declined to intervene. On June 9, 2016, Crockett filed the amended complaint that is the basis for this appeal.

Crockett's amended complaint advanced five claims for relief: three claims of FCA violations, one claim of FCA retaliation, and one claim of discharge against Michigan public policy. Crockett primarily alleged that Complete Rehab's admission and coding policy resulted in false claims by inducing the government to pay for more services than Complete Rehab's Medicare patients required. On the key issue of whether such admission and coding led to a claim against the government, Crockett acknowledged that she did not identify any false bill submitted by Complete Rehab or Bortz. However, Crockett argued that it was reasonable for her to allege that such claims were submitted, "given the intense pressure on Ms. Crockett to log hours worked, increase productivity on Medicare Part A and Medicare B patients, send out weekly reports on the hours worked on these patients, and the daily review by Ulrey of the minutes worked on these patients."

Crockett also alleged a second FCA violation in the form of "reverse false claims"—that Complete Rehab purportedly concealed overpayments by the government by not informing the government that Complete Rehab's submissions were fraudulent—and a third FCA violation in what she claimed was a conspiracy between Complete Rehab and Bortz to overbill the United States. Crockett also claimed that FCA retaliation occurred: Complete Rehab fired her because of her resistance to Complete Rehab's alleged violations of the FCA. Finally, Crockett alleged that she was discharged in violation of Michigan public policy, in being fired for resisting a violation of the law and of the professional and medical ethics rules applicable to her.

The district court dismissed the entire complaint, on the grounds that the amended complaint lacked "any specific identification of a false claim." The district court acknowledged

7

that Crockett had identified examples of potential improprieties at Complete Rehab, but found that she had not shown that any bill actually submitted to the government was affected by them. Because Rule 9(b)'s particularity requirement demanded that an FCA complaint must identify a claim that was actually false, which Crockett had not, the court held that all of Crockett's three FCA fraud claims were subject to dismissal.

The district court also dismissed the FCA retaliation claim because it found that Crockett failed to allege that she was fired for engaging in protected activity. While acknowledging that FCA retaliation protects an employee trying to stop FCA violations, the court found that Crockett's emails to Ulrey did not contain allegations of such efforts to report fraud, but rather reflected a dispute between professionals over appropriate levels of medical treatment. Finally, the district court dismissed the claim of unlawful discharge against Michigan public policy because the Michigan Supreme Court does not recognize this protection if another statutory scheme covers the relevant conduct, as the FCA does here.

Crockett now appeals.

## II.

### A.

The district court correctly dismissed Crockett's FCA fraud claims because Crockett failed to allege with the particularity required by Rule 9(b) that a specific false claim was submitted to the United States. Crockett identified various improprieties that, if credited, could demonstrate that Complete Rehab provided patients with more treatments than medical need justified. Crockett did not, however, show—especially not with any particularity—that the United States was charged for this purported over-treatment, or that there was a claim on the government. Indeed, in her complaint, Crockett expressly conceded she "never had access to

Complete Rehab's billing or to the specific claims submitted to the government for reimbursement." Crockett's inability to identify any particular false claim means the court below was correct in finding that her FCA fraud claims fail.

Under the Federal Rules of Civil Procedure, when "alleging fraud or mistake," a complaining party must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). As we have stated, this pleading standard in the FCA fraud context means that a plaintiff must sufficiently plead not only "that the defendant [made] a false statement," but also "that the defendant . . . submitted a claim for payment to the federal government" involving the false statement. *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (quoting *U.S ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 (6th Cir. 2010)). In Crockett's complaint, there might be specific indications that Complete Rehab submitted padded bills to Bortz, but there is only speculation as to whether Complete Rehab's treatments resulted in the submission of a claim to the government. Even if Complete Rehab's over-treatments were billed to Bortz, an FCA fraud claim would only accrue if Bortz then passed along those charges to the government, but Crockett does not allege instances of that occurring here.

In similar contexts, we have held that failure to identify claims that were actually submitted to the government subjects an FCA fraud claim to dismissal, even where a relator alleged fraudulent actions with more particularity than Crockett did here. For example, in *Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir. 2011), we held that relators who had interpreted allegedly defective medical images produced by the defendant's imaging technology could not proceed with an FCA fraud claim because "[the relators] cannot identify any actual claims made by [the defendant] for payment." *Id.* at 470. Likewise, in *United States ex rel.*

*Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007), we held that claims by a hospital therapist who had identified various allegedly fraudulent schemes involving upcoding were subject to dismissal because the therapist had not stated how the schemes resulted in particular false claims to the United States. *See, e.g., id.* at 514. In both *Bledsoe* and *Chesbrough*, we held that a medical professional like Crockett cannot establish an FCA fraud claim by simply identifying a scheme that the professional considers improper medical practice. *See Chesbrough*, 655 F.3d at 470. Instead, a relator must also allege with particularity that the scheme involved submissions to the government, and where a relator does not do so, her claim is subject to dismissal. *See id.* Such is the case here.

In her complaint, Crockett concedes her lack of knowledge of any bill to the United States, but identifies circumstantial reasons that suggest Complete Rehab committed upcoding fraud: "the intense pressure on Ms. Crockett to log hours worked, increase productivity on Medicare Part A and Medicare B patients, send out weekly reports on the hours worked on these patients, and the daily review by Ms. Ulrey of the minutes worked on these patients." But even crediting the existence of a high-pressure environment at Complete Rehab, two additional inferences are required to find an FCA fraud claim here. First, one must believe that Complete Rehab included those additional hours on its bill to Bortz; and second, that Bortz then used those padded bills from Complete Rehab as a basis for a subsequent claim on the government. Although Crockett's evidence might suggest that this first inference is plausible, she offers nothing but guesswork on that second and more crucial step. Bortz might have passed those allegedly padded bills along, or Bortz may have revised or rejected them. Without any allegations regarding Bortz's activities, Crockett's description of the conditions at Complete Rehab is not enough to satisfy the heighted requirement of Rule 9(b), which demands more

specificity than just a possibility that fraud occurred somewhere. *See Bledsoe*, 501 F.3d at 505 & n.13.

It is true that we have also recognized a narrow exception to this rule for billing employees who have detailed personal knowledge of the submitting entity's billing practices. *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 769 (6th Cir. 2016). In such cases, we relax the standard slightly, reasoning that such employees can create a "strong inference that a [fraudulent] claim was submitted" by alleging detailed facts about the circumstances surrounding the alleged claims. *Id.* (quoting *Chesbrough*, 655 F.3d at 471). But Crockett cannot invoke that exception here, because she lacks any personal knowledge of Bortz's billing practices. In *Prather*, for example, we held that a sufficiently robust inference of false claims existed because the relator there worked in a medical facility's billing department, was hired specifically to help process a backlog of Medicare claims, identified specific patients, alleged specific fraud on those patients' claims, and offered extensive evidence suggesting that the claims were actually submitted to Medicare. *Id.* at 769-70. Key in particular was the *Prather* relator's "detailed personal knowledge of billing practices and specific identified claims," as well as the fact that the relator completed one of the final steps before a claim was submitted to Medicare. *Id.* at 771. By contrast, Crockett specifically disavows any knowledge of how Complete Rehab charged Bortz or how Bortz submitted bills to the federal government, and several intermediaries existed between the behavior Crockett observed and the submissions of claims to the government. Therefore, Crockett lacks the very knowledge that *Prather* used to justify an exception to Rule 9—and for that reason, she cannot invoke the relaxed standard. *See id.* at 769-71 (stating that although previous cases had declined to create the exception because

the "facts . . . did not warrant its application," Ms. Prather had alleged "specific personal knowledge that relates directly to billing practices.").

Crockett finally contends that she has a basis for a strong inference of fraudulent claims because she was exposed to patients' coding and assignments to a Resource Utilization Group, and that coding was "the very basis of their Medicare billing." Yet this contention stretches the knowledge she actually had too far. Without specific indications about how coding passed on from Complete Rehab to Bortz, and from Bortz to claims to the government, all Crockett could allege is that Complete Rehab coded patients in a way that "could have led, but need not necessarily have led, to the submission of false claims." *Prather*, 838 F.3d at 773 (citation and emphasis removed). But no FCA violation would have occurred if Complete Rehab did not use this coding as the basis for its bills to Bortz, or if Bortz did not then also use the coding as the basis for its bills to the government. *Prather*, even while it established an exception for some billing employees, expressly recognized that everyone else must plead false claims with particularity. *Id.* And in the context of Rule 9(b), a fraud claim requires something more than Crockett's speculation here—it requires personal knowledge of Bortz's billing practices. The district court thus did not err when it found that Crockett had not pleaded the existence of a specific false claim (or the strong inference of a false claim) submitted to the government.

Crockett's inability to show that false claims were actually submitted to the government means that her reverse-false-claims and false-claims-conspiracy counts are likewise subject to dismissal, because the existence of such false claims is a precondition to either theory on these facts. In a reverse-false-claims case, a relator must show "an obligation to pay or transmit money or property to the Government" that is "avoid[ed] or decrease[d]" through "a false record or statement." 31 U.S.C. § 3729(a)(1)(G). Crockett's theory here is that Complete Rehab made

a false statement to the government when it did not inform the government that Medicare had paid improperly high bills from Complete Rehab. Leaving aside the issue of whether this actually constitutes a reverse-false-claim, Crockett's theory still requires the assumption that the United States actually received, much less paid, any over-stated bills from Complete Rehab. Because Crockett does not specify any concrete obligation owed to the United States, her reverse-false-claims count is subject to dismissal. *See Chesbrough*, 655 F.3d at 473.

Crockett's lack of specification as to the existence of any false claim also precludes her false-claims-conspiracy count. An FCA conspiracy requires a "request or demand" intended to be paid by the government. *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 670 (2008). Here, Crockett identifies no such specific request or demand, and she has specifically disavowed any personal knowledge of how Complete Rehab's and Bortz's billing departments interacted. As with Crockett's other FCA fraud claims, there is no specific identification of a particular claim improperly made on the government by virtue of the alleged conspiracy between Bortz and Complete Rehab. The district court thus did not err when it dismissed Crockett's FCA fraud claim, as well as her reverse-false-claims and false-claims-conspiracy count.

### B.

Although Crockett's three FCA claims about Complete Rehab's billing were subject to dismissal, she is entitled to proceed on her FCA retaliation claim, because such claims are not subject to Rule 9(b)'s heightened standards, and Crockett otherwise sufficiently pleaded that she was fired because of her efforts to stop what Crockett reasonably believed was fraud on the government. The FCA protects employees from discharge "because of lawful acts done by the employee . . . in furtherance of . . . efforts to stop . . . violations of [the FCA]." 31 U.S.C. § 3730(h)(1). As Crockett contends, Complete Rehab fired her because she had objected to

Ulrey's demands that Crockett provide patients with more therapy than necessary or appropriate. Crockett's numerous emails create the plausibility necessary to survive a motion to dismiss on this theory. Most notably, Crockett identified her September 19th email, in which she had stated that she "cannot comply with your request to have all Med[icare Part] A [patients] in Ultra High," because "[s]etting all patients at the ultra high level, regardless of medical status, is not appropriate," and that "[p]rofessional standards require acting with nonmaleficence and veracity." It is undisputed that Crockett was fired nine days after sending this email, and Crockett alleges that her motivation in sending it was to prevent what she believed was upcoding fraud leading to over-payments from Medicare. Crockett thus offers enough facts to proceed to discovery on her FCA retaliation claim.

It is true that Crockett has still not pleaded a specific FCA violation, in that she does not identify claims actually submitted to the government because of the misfeasance she identifies. But, as the Ninth Circuit has explained, "unlike a FCA violation claim, a FCA retaliation claim 'does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b).'" *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 238 n. 23 (1st Cir. 2004)). Thus, as we have held, a plaintiff "need not establish that [the employer] actually violated the FCA," so long as she "show[s] that her allegations of fraud grew out of a reasonable belief in such fraud." *Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394, 400 (6th Cir. 2015)); *see also Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 n.1 (2005). Crockett's allegations meet that lower standard required to survive a motion to dismiss on a FCA retaliation claim, in that she sufficiently alleges that she acted in furtherance of efforts to stop FCA violations.

In particular, Crockett pleads that she was fired for identifying what she says was upcoding causing Medicare to pay more than patients' circumstances warranted. Crockett unquestionably believed that Complete Rehab's practices were not guided by the needs of its patients: her complaints about medical "appropriate[ness]," and "nonmaleficence and veracity" testify to that fact. In addition, Crockett linked her objections about those practices to a purported fraud on the government through her allegation that the only reason why Complete Rehab persisted in these practices was to increase revenue. Although these allegations are not specific enough to constitute an FCA fraud claim, in that they do not meet the heightened specificity standards of Rule 9(b), they permit the continuation of a FCA retaliation claim, which need only meet the more lenient plausibility standards of Rule 8(a). *See Mendiondo*, 521 F.3d at 1102–03.

It is true that Crockett did not explicitly specify in her objections to Ulrey that her objections were founded in concerns about improper government disbursements. If she had done this, then we would have no trouble reinstating her FCA retaliation claims. As it stands, however, this is a much closer issue. On a motion to dismiss, we credit, as we must, Crockett's representations that Ulrey would have understood Crockett's complaints to implicate fraud on the government, given Crockett's previous objections about Complete Rehab's drive for revenues, and the knowledge of everyone involved that "Med A"s and "Med B"s are patients whose rehabilitation costs are charged to the government. This inference is strengthened by the fact that the government will only pay for services that are medically appropriate for each Medicare patient. *See* 42 C.F.R. §§ 413.335, 413.335, 413.337, 483.20. Crockett's complaints were also linked to the jargon used in Medicare billing, such as "ultra high," "clinically appropriate RUG levels," and "national averages regarding RUG levels." Where, as here,

otherwise ordinary complaints about medical ethics are *inherently* tied to the standards for Medicare billing and where, as here, the whistleblower is clearly using Medicare-billing terminology when complaining to her superiors, she has pled the notice element of an FCA retaliation claim.

Crockett's allegations are also sufficient at this stage to satisfy the requirement that a FCA retaliation claim demands that an employee's belief in the presence of FCA violations be a reasonable one. For example, we held that a hospital executive's FCA retaliation claim failed because the executive did not reasonably believe that an ambulance company offering trivial amounts of food and clothing to low-level employees was conspiring with those employees to improperly direct business to that company. *Jones-McNamara*, 630 F. App'x at 402. We have also rejected an FCA retaliation claim where a relator was fired after reporting a bribe, but the relator had known that the bribe had been rejected at the time she reported it, and so did not reasonably believe that reporting the bribe would prevent fraud on the government. *Miller v. Abbott Labs.*, 648 F. App'x 555, 562 (6th Cir. 2016). Here, by contrast, Crockett knew that a patient's coding provided the basis for Medicare to be charged, and that this coding would directly result in government payments if passed on unchanged. From Crockett's perspective, this coding and treatment could translate into claims on the government, given Crockett's assertions that the actions were revenue-driven, and her knowledge that the ultimate payments came from Medicare.

This is not to say that any employee who complains of practices at an employer delivering services to the government can claim FCA retaliation if subsequently fired. Rather, an employee must show some linkage between the activities they complain of and fraud on the government. *See Jones-McNamara*, 630 F. App'x at 399. Here, Crockett meets that standard

16

because there was a tight link between Crockett's complaints about improperly coding and treating Medicare patients, and the subsequent assumption that Medicare would pay on the basis of that improper coding and treatment. By contrast, we held in *Miller* that an employee who reported a $50 bribe that had already been rejected did not allege fraud on the government, because such fraud would only have occurred if the briber returned with another, larger bribe, that money was accepted, and then the person bribed committed fraud on the government. *See Miller*, 648 F. App'x at 562. Crockett thus presents a less speculative and more concrete basis for her FCA retaliation claim, and overcomes the hurdle necessary to survive a motion to dismiss here, given that this question is governed by the less exacting standards of Rule 8(a).

Complete Rehab contends that Crockett is not entitled to proceed to discovery on her FCA retaliation claim because her complaints related to a purported lack of professional standards at Complete Rehab, rather than a specific fraud on the government. The FCA, it is true, is not intended as a general statute to enforce professional medical standards. But on the alleged facts, it is plausible that professional standards were violated for the very purpose of defrauding the government. Complete Rehab's proposed interpretation of these facts therefore does not mean that Crockett's FCA retaliation claim must be dismissed.

Complete Rehab also contends that a high treatment level is generally the more appropriate plan for care, and so its treatments were not fraudulent. This is, of course, a dispute too early to resolve on a motion to dismiss. Crockett is thus entitled to proceed to discovery on her FCA retaliation claim.

## C.

Finally, the district court properly dismissed the Michigan public policy count, in that this protection does not apply to Crockett's case. Michigan only recognizes the common-law claim

17

of wrongful discharge in violation of public policy "where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993). Here the FCA retaliation provision is "an applicable prohibition against discharge in retaliation for the conduct at issue," in that it already covers the conduct for which Crockett seeks protection. Crockett's factual basis for the two claims is the same, and her theory for relief identical. The Michigan wrongful discharge claim therefore does not exist in this context. To resist that conclusion, Crockett cites a district court opinion that allowed a Michigan public policy claim to survive a dismissal motion, despite dismissing several FCA claims. *Hendricks v. Bronson Methodist Hosp., Inc.*, No. 1:13–CV–294, 2014 WL 3752917 (W.D. Mich. July 30, 2014). But this opinion is not binding, and does not address the limitations relied upon here. *See id.* at *7.

The district court therefore correctly dismissed Crockett's public policy claim.

### III.

The judgment of the district court is affirmed with respect to the FCA fraud claims and Michigan public policy discharge claim; reversed with respect to the FCA retaliation claim; and remanded for further proceedings consistent with this opinion.